UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
BRIAN T. WEISS, On Behalf of Himself and   :   Civil Action No.
All Others Similarly Situated,   :
  :   <u>CLASS ACTION</u>
            Plaintiff,   :
  :   COMPLAINT FOR VIOLATION OF THE
     vs.   :   FEDERAL SECURITIES LAWS
  :
FRIEDMAN, BILLINGS, RAMSEY GROUP,   :
INC., ERIC F. BILLINGS, EMANUEL J.   :
FRIEDMAN and KURT R. HARRINGTON,   :
  :
            Defendants.   :
———————————————————— x    <u>DEMAND FOR JURY TRIAL</u>

## NATURE OF THE ACTION

1.     This is a class action on behalf of purchasers of the common stock of Friedman, Billings, Ramsey Group, Inc. ("FBR" or the "Company") between January 29, 2003 and April 25, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     FBR is an investment bank that provides investment banking, institutional brokerage and asset management services, and invests as principal in mortgage-backed securities ("MBS") and merchant banking investments.  In March 2003, the Company was formed through the merger of two existing companies, both engaged in related business and both managed by the FBR management team.

3.     On November 9, 2004, FBR filed its third quarter 2004 Form 10-Q in which it disclosed an SEC and NASD investigation:

> Friedman, Billings, Ramsey & Co., Inc. ("FBR & Co") is involved in investigations by the SEC and the NASD concerning its role in 2001 as a placement agent for an issuer in a PIPE (private investment in public equity) transaction.  The Company has cooperated fully with the investigations.  To date, neither the SEC nor the NASD has initiated proceeding against the Company or its employees in connection with the investigations.

> In addition, one of the Company's investment adviser subsidiaries, Money Management Associates, Inc. ("MMA") and one of its now closed mutual funds, are involved in an investigation by the SEC with regard to certain losses sustained by the fund in 2003.  The Company has cooperated fully with the investigation.  To date, the SEC has not initiated proceedings against the Company or its employees in connection with the investigation.

> Since no proceedings have been initiated in these investigations, it is inherently difficult to predict the outcome of the investigations or their affect on FBR & Co., MMA or the Company.  Either or both agencies may initiate proceeding as a result of the investigations and such proceedings could result in adverse judgments, injunctions, fines, penalties or other relief against the Company or one or more of its employees.

4.     On this news, FBR's stock dropped to $16.93 per share, some 40% lower than the Class Period high of $28.70 per share.  However, the market was not apprised as to the seriousness of the investigation, nor that FBR's earnings were not sustainable.  On April 4, 2005, Emanuel J. Friedman, the CEO, resigned.  Then, on April 25, 2005, after the market closed, FBR announced disappointing preliminary results for the first quarter 2005, including a charge for its liability in the PIPE transaction.  On this news, FBR's stock dropped to $12.52 on volume of 7.5 million shares

5.     The true facts, which were known to each of the defendants during the Class Period but were concealed from FBR's shareholders, include:

(a)     The 2001 PIPE transaction manipulation was extremely serious and reached the highest level of the Company;

(b)     FBR's earnings would be adversely affected by charges related to the investigation into the PIPE transaction and due to the problems the bad publicity would cause FBR; and

(c)     FBR's 2005 EPS would be much worse than market expectations due to the PIPE transaction as well as due to interest rate increases which would have a much more severe impact on FBR's business than defendants had represented to the market.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

8.     Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b), because the defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

9.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.     Plaintiff Brian T. Weiss purchased the common stock of FBR at artificially inflated prices during the Class Period, as set forth in the accompanying certification, and has been damaged thereby.

11.     Defendant FBR is an investment bank with its investment banking business based in New York, New York, that provides institutional brokerage, investment banking and asset management services, and invests as principal in MBS and merchant banking investments.  FBR is publicly traded on the NYSE under the ticker symbol "FBR."

12.     Defendant Eric F. Billings ("Billings") was, at all relevant times, Co-Chief Executive Officer and Co-Chairman of FBR.

13.     Defendant Emanuel J. Friedman ("Friedman") was, at all relevant times, Co-Chairman and Co-Chief Executive Officer of FBR.

14.     Defendant Kurt R. Harrington ("Harrington") was, at all relevant times, CFO of FBR.

15.     The defendants referenced above in ¶¶12-14 are referred to herein as the "Individual Defendants."

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

16.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends,

financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

17.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of FBR, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

18.    As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any

previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

20.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of FBR common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding FBR's business, operations, management and the intrinsic value of FBR stock; (ii) enabled the defendants to raise $374 million in a secondary stock offering; and (iii) caused plaintiff and other members of the Class to purchase FBR common stock at artificially inflated prices.

21.     As alleged herein, defendants acted with scienter in that defendants had actual knowledge that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in the

issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding FBR and their control over and/or receipt and/or modification of FBR's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning FBR, participated in the fraudulent scheme alleged herein.  This scheme deceived the investing public regarding FBR's business, financial results, growth, operations and the intrinsic value of FBR stock and allowed defendants to complete the acquisition of First NLS Financial Services, LLC ("First NLS") in February 2005 using inflated stock as part of the purchase price, and raise $374 million in a secondary stock offering in October 2003.  The scheme also caused plaintiff and other members of the Class to purchase or otherwise acquire FBR stock in a market in which the price of FBR stock was artificially inflated.

## BACKGROUND

22.     FBR is an investment bank that provides investment banking, institutional brokerage and asset management services, and invests as principal in MBS and merchant banking investments. In March 2003, the Company was formed through the merger of two existing companies, both engaged in related business and both managed by the FBR management team.  FBR's primary broker-dealer subsidiary was Friedman, Billings, Ramsey & Co., Inc. ("FBR & Co.").

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

23.     On January 29, 2003, FBR issued a press release entitled "Friedman, Billings, Ramsey Group, Inc. Reports Fourth Quarter 2002 Results Net Income of $10.1 million, or $0.22 per Share (Basic) for the Quarter; Company Reports Annual Net Income of $52.4 Million, or $1.14 per Share (Basic)."  The press release stated in part:

Friedman, Billings, Ramsey Group, Inc. today reported net income after tax of $10.1 million, or $0.22 (basic), $0.21 (diluted) per share on revenues of $58.9 million, for the quarter ended December 31, 2002, compared to net income before extraordinary gain of $9.6 million, or $0.21 (basic and diluted) per share on revenues of $61.4 million in the fourth quarter of 2001. The company fully utilized its operating loss carry forwards and began recording income tax expense during the second half of 2002; pre-tax net income for the fourth quarter 2002 was $10.8 million, compared to $7.8 million before extraordinary gain for the fourth quarter.

These results do not include any impact from the planned re-deployment of $70 million of excess capital into a leveraged mortgage backed security (MBS) investment strategy that the company began to implement at the end of the fourth quarter. The company closed on the first tranche of MBS purchases this week with the purchase of $350 million of MBS, utilizing $35 million of re-deployed equity capital.

For the full year 2002, FBR reported net income before extraordinary gain of $52.4 million or $1.14 (basic), $1.08 (diluted) per share, on revenues of $268.2 million, compared to a net loss before extraordinary gain of $(13.9) million or $(0.29) (basic and diluted) per share on revenues of $160.8 million the previous year.

"FBR's record annual results were driven by continued revenue growth across investment banking, institutional brokerage and asset management," said Emanuel J. Friedman, Chairman and Co-CEO. "For full year 2002 revenue growth was 67% compared to 2001, including revenue growth of 73% in investment banking, 18% in institutional brokerage and 264% in asset management. We continue to actively hire senior producers across our business."

"We are gratified with our 2002 results which confirm the success of our continued expansion, and which run counter to the performance of many in our industry," said Vice Chairman and Co-CEO Eric F. Billings. "FBR remains strongly positioned to grow revenues, offering innovative capital solutions and independent research views. The combination of over $269 million in equity (including employee stock purchase loans) with virtually no leverage, prudent hiring and cost discipline allow us to achieve good cash returns on our equity capital, even in a difficult market– as evidenced by our return on average equity for the year of 25%."

24.     On May 7, 2003, FBR issued a press release entitled "FBR Reports First Quarter 2003 Net Income of $5.7 Million, or $0.12 Per Share (Basic)"  The press release stated in part:

Friedman, Billings, Ramsey Group, Inc. today reported net income after tax of $5.7 million, or $0.12 (basic and diluted) per share on revenues of $49.5 million for the quarter ended March 31, 2003, compared to net income before extraordinary gain of $8.9 million, or $0.19 (basic and diluted) per share on revenues of $54.4 million for the first quarter of 2002.  In the first quarter of 2003, the company's results reflected a $2.8 million income tax provision while in the first quarter of 2002, the company's

results reflected no provision for income taxes due to operating loss carry forwards that were exhausted during 2002. Pre-tax income for the first quarter 2003 was $8.6 million, compared to $8.9 million before extraordinary gain for the first quarter 2002.

On March 31, 2003, FBR completed its merger with FBR Asset Investment Corporation, forming a new company known as Friedman, Billings, Ramsey Group, Inc. Accordingly, the company also is disclosing its results on a pro forma basis, in accordance with SEC Regulation S-X, Article 11, assuming the merger had occurred on January 1, 2002. On this basis, the company reported pro forma net income after tax of $31.5 million, or $0.24 (basic), $0.23 (diluted) per share on revenues of $96.8 million for the quarter ended March 31, 2003.

The merger pro forma results for the first quarter 2003 include:

--      merger-related expenses of $2.8 million, or $0.02 per share (basic), and

--      the negative impact of purchase accounting adjustments resulting from the merger, of $3.0 million, or $0.02 per share (basic).

--      In addition, average mortgage-backed securities (MBS) assets during the quarter were $5.7 billion at an average net interest spread of 2.30%. As of today, the company has contracted for additional MBS purchases that would result in a portfolio of approximately $7.5 billion by June 30, meeting the company's targeted asset levels.

"We clearly expect that our earnings in the coming quarters will support our $0.34 quarterly dividend with the deployment of our excess capital at targeted leverage levels in the mortgage-backed portfolio," said Emanuel J. Friedman, Co-Chairman and Co-CEO.

"As a result of the merger, we are already seeing a very positive impact in the second quarter in our capital markets business, especially in our success in attracting investment banking business," said Co-Chairman and Co-CEO Eric F. Billings. "As of today, we are engaged on 31 lead-managed capital raising and M&A transactions representing more than $3.5 billion of potential transaction value. In the first quarter of 2003 we completed two lead-managed transactions and five M&A transactions totaling $355 million in transaction value. We are therefore highly optimistic that our capital markets business, which was close to break-even level in the first quarter, can provide the growth and retained earnings that we expect over future quarters, in addition to the cash dividends supported primarily by the MBS portfolio."

At March 31, 2003, FBR's MBS portfolio, representing the aggregate of the former FBR Asset's portfolio and FBR Group's own MBS portfolio, totaled $5.0 billion at fair value and the company's corresponding repurchase agreement liabilities were $4.3 billion, resulting in leverage to allocated capital of 6.5 to 1 in the MBS portfolio. The company targets leverage of 6 to 11 times in the MBS portfolio.

The weighted average annualized yield of FBR's MBS portfolio was 4.07% during the first quarter and the company's weighted average cost of financing for the mortgage-backed securities was 1.77% (including the cost of hedging) resulting in an average net interest spread of 2.30% (combining the portfolios of FBR Asset and FBR Group pre-merger). The spread in the first quarter was down slightly from FBR Asset's spread of 2.47% during the fourth quarter 2002 as a result of lower asset yields, partially offset by a lower cost of funds. Starting in mid-July 2003, approximately $3 billion of one-year interest rate swaps will expire with a cash basis funding cost of 2.15% which has been substantially replaced with funding that will expire in April 2004 with a funding cost of 1.35%.

Prior to the merger, FBR Asset's MBS portfolio premium equaled 1.7%. Purchase accounting adjustments recorded at the date of the merger resulted in an increase in the premium of the MBS portfolio to 2.7%. The increased premium will be amortized against the coupon of the securities in future periods, and such amortization is also reflected in the merger pro forma. The increased premium amortization will have no impact on the cash equivalent earnings generated by the portfolio.

25.    On July 29, 2003, FBR issued a press release entitled "FBR Reports Second Quarter 2003 Net Income of $58.8 Million, or $.43 per Share (Basic and Diluted)." The press release stated in part:

Friedman, Billings, Ramsey Group, Inc. today reported net income after tax of $58.8 million, or $.43 (basic and diluted) per share on gross revenues of $148.4 million for the quarter ended June 30, 2003, compared to net income of $17.8 million, or $.39 (basic), $.36 (diluted) per share on gross revenues of $73.3 million for the second quarter of 2002.

On March 31, 2003, FBR completed its merger with FBR Asset Investment Corporation, forming a new company known as Friedman, Billings, Ramsey Group, Inc. Accordingly, the company also is disclosing its results on a pro forma basis, in accordance with SEC Regulation S-X, Article 11, assuming the merger had occurred on January 1, 2002. On this basis, for the quarter ended June 30, 2002 the company reported pro forma net income before extraordinary gain of $31.6 million, or $.30 (basic), $.29 (diluted) per share on pro forma gross revenues of $98.8 million.

"The quarter visibly demonstrated our merged company's business model, with our balance sheet businesses more than covering our $.34 quarterly dividend, and our capital markets and asset management businesses retaining approximately $10 million in after-tax earnings and maintaining the company's dynamic growth characteristic," said Co-Chairman and Co-CEO Emanuel J. Friedman. "During the quarter, we grew the mortgage-backed securities (MBS) portfolio from only $5.0 billion at March 31 to $8.1 billion at June 30, with an average spread during the

quarter of 1.99%.  At these levels, we reasonably expect our balance sheet businesses alone to cover our dividend."

"We are extremely pleased by the impact that the merger has already had on our business, particularly investment banking, institutional brokerage and merchant banking," said Co-Chairman and Co-CEO Eric F. Billings.  "While we expected to see these benefits over time, it seems that the merger has already transformed our company, and our customers' understanding of the company and the unique strengths of our franchise in the very first quarter after the merger.  For example, our investment banking backlog exceeds anything we have seen in our history."

26.     On October 3, 2003, FBR completed a secondary offering of 23 million shares of its stock at $17 per share for proceeds of $373.9 million.

27.     On October 28, 2003, FBR issued a press release entitled "FBR Reports Third Quarter 2003 Net Income of $57 Million, or $0.42 (Basic) and $0.41 (Diluted) Per Share $0.41 (Diluted) Per Share."  The press release stated in part:

Friedman, Billings, Ramsey Group, Inc. today reported net income after tax of $57 million, or $0.42 (basic) and $0.41 (diluted) per share, on gross revenues of $185 million for the quarter ended September 30, 2003, compared to net income of $15.1 million, or $0.33 (basic) and $0.31 (diluted) per share on gross revenues of $81.7 million for the third quarter of 2002.

Reflected in these results is the negative impact of purchase accounting adjustments related to FBR's merger with FBR Asset Investment Corporation on March 31, 2003. As a result of the purchase accounting step-up in the basis of the mortgage-backed securities (MBS) owned by FBR Asset at the time of the merger, non-cash premium amortization is greater than it would have been without these adjustments. The impact of the increased amortization (the "Merger Amortization") associated with the step-up reduced net interest income by $0.07 per share during the quarter. In addition, following the merger and the establishment of a quarterly dividend payment by FBR Group, FBR treats as compensation expense the dividends paid on employee-owned shares pledged in connection with stock incentive loans to those employees. The impact of this additional compensation expense was $0.02 per share during the quarter. The company believes this is important because it currently plans to sell these loans, eliminating this expense.

Adjusting for the above two items, diluted earnings per share of $0.41 would increase by $0.09 to $0.50 per share for the third quarter.

*        *        *

- 10 -

In the institutional brokerage business, revenues continued to grow despite a continued reduction in spreads throughout the securities industry. Brokerage revenue for the quarter of $19.7 million exceeded revenue during the same quarter last year by 37%. The company believes that in addition to growing market share in both its investment banking and institutional brokerage businesses, in the future institutional brokerage revenues will grow at a faster rate as its market share becomes more comparable with that of investment banking.

In its asset management business, FBR recorded fee revenues of $7.2 million, including base management and administration fees of $5.6 million and non-cash incentive income of $1.6 million. Net assets under management totaled $1.8 billion as of September 30, 2003, representing a 28% increase from September 30, 2002.

"In addition to the continued growth of each of our operating businesses, FBR completed several strategic initiatives during the third quarter," added Emanuel J. Friedman, Co-Chairman and Co-CEO. "In July we added a team of ABS bankers providing FBR with its first entry into the structured finance fixed-income business. This group will focus on the securitization of non-prime mortgage assets. This is an industry where FBR maintains the leadership position in equity underwriting and has extensive issuer relationships. Also during the quarter, FBR established a $5 billion A1+/P1 rated asset-backed commercial paper vehicle called Georgetown Funding, which has strengthened and diversified our funding sources for our agency-backed MBS portfolio."

28.     On February 4, 2004, FBR issued a press release entitled "FBR Reports Record Earnings per Share of $0.49 (Diluted) for the Fourth Quarter 2003." The press release stated in part:

Friedman, Billings, Ramsey Group, Inc. today announced record earnings for full year 2003 and for the quarter ended December 31, 2003. Net income was $201.4 million, or $1.68 (basic) and $1.63 (diluted) per share, for the year ended December 31, 2003 compared to $53.3 million, or $1.16 (basic) and $1.10 (diluted) per share, for the year ended December 31, 2002. For the quarter ended December 31, 2003, net income was $80 million, or $0.50 (basic) and $0.49 (diluted) per share, compared to $10.1 million, or $0.22 (basic) and $0.21 (diluted) per share, for the prior year's comparable period.

Reflected in these results is the negative impact of purchase accounting adjustments related to FBR's merger with FBR Asset Investment Corporation (FBR Asset) on March 31, 2003. Adjusting for the impact of these purchase accounting adjustments on asset yields and cost of funds would increase the full year diluted earnings per share of $1.63 by $0.10 to $1.73 and the fourth quarter diluted earnings per share of $0.49 by $0.01 to $0.50.

The company had 165.2 million shares outstanding at December 31, 2003 and weighted average diluted shares outstanding during the year were 123.3 million. FBR declared a quarterly dividend of $0.34 per share on December 11, 2003, to

shareholders of record as of December 31, 2003.  For the full year, the company declared a total of $1.36 per share in dividends and increased its book value per share by 78% from $5.28 at December 31, 2002 to $9.41 at December 31, 2003.  The dividends and increase in book value per share provided a 104% total return on equity to shareholders in 2003.

FBR's record performance in 2003 is attributable to a number of factors, including the company's merger with FBR Asset at the end of the first quarter, the continued growth and success of each of the company's operating businesses, particularly its investment and merchant banking businesses, and the strong performance of the company's mortgage-backed securities (MBS) business despite a challenging third quarter environment.

The company's fourth quarter reflected continued strong performance in its investment banking business and a normalization of the net interest margin in its mortgage-backed securities business as the extremely high prepayment speeds in the third quarter moderated significantly in the last three months of 2003.  In addition, the company achieved record earnings during the quarter despite running lower than its targeted leverage in the MBS portfolio as it invested proceeds from its $450 million follow-on offering in October.  Additionally, the company realized no gains in its merchant banking business during the quarter.  Unrealized gains, however, did increase from $50.7 million at September 30, 2003 to $96 million at December 31, 2003.

"The last three months of 2003 represented a record quarter for the company and the culmination of a record year.  In reflecting on 2003, several things clearly contributed to our success.  First and foremost, our merger with FBR Asset represented a historic event for our company.  In addition, our unwavering discipline has allowed us to continue our industry-leading after-market performance, and is further evidenced by the returns and performance in all aspects of our business.  Finally, this discipline and performance has allowed us to create a company that possesses what we believe is the broadest, deepest institutional distribution for equity securities in the United States today.  These factors, together, have allowed us to become one of the leading investment banking firms in the United States," said Eric F. Billings, Co-Chairman and Co-CEO.  "With regard to our balance sheet businesses, as we predicted in the third quarter call, prepayment speeds slowed considerably in the fourth quarter allowing the net interest spread in our MBS portfolio to trend back closer to historical averages.  As of the end of December we have fully deployed the capital we raised in October in our merchant banking and MBS portfolios.  Consequently, we expect higher earnings in the first quarter of 2004 from both our MBS portfolio, as we anticipate operating with full leverage, and our merchant banking business, assuming normalized realized income from this portfolio."

(Footnote omitted.)

29.    On April 27, 2004, FBR issued a press release entitled "FBR Reports Record Earnings per Share of $0.54 (Basic and Diluted) for the First Quarter of 2004; Earnings Per Share Up 350% Versus Same Period Last Year."  The press release stated in part:

> Friedman, Billings, Ramsey Group, Inc. today announced record earnings for the quarter ended March 31, 2004.  Net income after tax for the quarter ended March 31, 2004 was $89.6 million, or $0.54 per share (basic and diluted), compared to $5.7 million, or $0.12 per share (basic and diluted), for the first quarter of 2003.

> "Just over a year ago, after completing the merger of our two companies, we advised our shareholders that the combination of our operating businesses and a strong balance sheet would have a profoundly positive impact on our entire firm. Since that time, we have profitably grown and broadened each of our lines of business.  FBR's record results for the first quarter are evidence that our strategy and execution have been effective," said Eric F. Billings, Co-Chairman and Co-Chief Executive Officer.  "Our progress into the second quarter is keeping us solidly on track to meet our goals for 2004.  The investment banking backlog continues to exceed five billion dollars, and we remain confident in our ability to execute our investment banking assignments through financial sector and interest rate volatility. We also expect our strategies for managing our mortgage-backed securities portfolio will continue to deliver resilient returns."

> Results for the first quarter of 2004 include expenditures of approximately $10 million related to FBR's sponsorship of its PGA TOUR event, The FBR Open, and associated advertising and promotional expenses.  FBR anticipates that the benefits resulting from the recognition achieved through these first quarter efforts will continue to accrue to the company throughout this year and future years.

> FBR had 165.6 million shares outstanding on March 31, 2004 and there were 167.3 million weighted average diluted shares outstanding during the quarter.  On March 10, 2004, the company declared a quarterly dividend of $0.34 per share, payable on April 30, 2004 to shareholders of record as of March 31, 2004.  The company intends to continue quarterly dividends of this amount and to the extent REIT earnings exceed the regular dividend amount, will consider declaring an additional special dividend in June and in December

30.    On August 3, 2004, FBR issued a press release entitled "FBR Reports Net Income of $81.2 Million for the Second Quarter of 2004; Diluted Earnings per Share increase 11% to $0.48, versus $0.43 for the Same Period Last Year."  The press release stated in part:

> Friedman, Billings, Ramsey Group, Inc. today announced net income after tax for the quarter ended June 30, 2004 of $81.2 million, or $0.48 per share (diluted), compared to $58.8 million, or $0.43 per share (diluted), for the second quarter of 2003.  Net

revenues for the quarter were $178.4 million, up 39% from net revenues of $128.7 million in the second quarter of 2003.

On June 10, 2004, FBR declared a quarterly regular dividend of $0.34 per share and a special dividend of $0.12 per share, paid on July 30, 2004 to shareholders of record as of June 30, 2004. The company earned a total of $170.8 million during the first six months of 2004, or $1.01 per share (diluted), and declared $0.80 per share of total dividends. During the first six months of 2003, the company declared $0.68 per share of total dividends. FBR intends to continue regular quarterly dividends and, to the extent that earnings from the REIT holding company exceed its regular quarterly dividend amount of $0.34 per share, will consider declaring an additional special dividend in December.

"During the first half of 2004 we experienced over 100% revenue growth year-over-year in our taxable subsidiaries. Our overall earnings capability has been enhanced by our growing investor and issuer client bases, as well as the increased recognition of our franchise and brand name.

Our second quarter investment banking revenues of $62 million grew 66% compared to the same period in 2003 and were within our range of expectations for any given quarter. However, these results do demonstrate the quarter to quarter volatility associated with the investment banking business when compared with our first quarter revenues of $91 million.

Importantly, third quarter revenue associated with transactions scheduled to close prior to August 6, 2004 will exceed that of the entire second quarter, and we continue to win new mandates from industry-leading clients and complete transactions from our backlog," said Eric F. Billings, Co-Chairman and Co-Chief Executive Officer.

Investment Banking

- FBR's investment banking operations achieved revenues of $62 million in the second quarter, an increase of 66% over the second quarter of 2003.

- In the second quarter of 2004, FBR raised $2.6 billion for issuers, including:

    -- $445 million in six initial public offerings

    -- $1.3 billion in follow-on equity offerings

    -- $382 million in private equity placements

    -- $500 million in corporate debt and non-convertible preferred securities.

- During the quarter FBR completed its largest advisory assignment to date, totaling more than $600 million in transaction value.

- FBR continues to be ranked number one in terms of the after-market performance of its equity underwritings over the trailing five year period ending June 30, 2004.

- FBR finished the first half of 2004 as the number six book-running manager of U.S. IPOs.

- During the second quarter of 2004 FBR grew its senior investment banking headcount by 14%.

"Our second quarter results reflect many of the strengths of our business model.  More importantly, despite what is perceived as a difficult market for real estate related equities, we have already lead-managed over $550 million of real estate-related offerings during the first part of the third quarter and continue to see strong activity in this sector.  Additionally, we believe the contributions we experienced in the second quarter from the diversified industrials and technology, media and telecom sectors will continue into the third quarter," said Emanuel J. Friedman, Co-Chairman and Co-Chief Executive Officer.

(Footnote omitted.)

31.    On October 26, 2004, FBR issued a press release entitled "FBR Announces Record Financial Results for the Third Quarter of 2004; Diluted Earnings Per Share Increase 34% to $0.55, Versus $0.41 for the Same Period Last Year."  The press release stated in part:

Friedman, Billings, Ramsey Group, Inc. today announced net income after tax for the quarter ended September 30, 2004 of $92.1 million, or $0.55 per share (diluted), compared to $57 million, or $0.41 per share (diluted), for the third quarter of 2003. Net revenues for the quarter were $243.7 million, up 50% from net revenues of $162 million in the third quarter of 2003.

Third Quarter and Nine Month Results

Quarter ended September 30, 2004:

- Record net earnings of $92.1 million, a 62% increase compared to $57 million for the third quarter of 2003

- Record earnings per share, up 34% to $0.55 compared to $0.41 for the third quarter of 2003

- A return on equity of 24.8% (23.5% excluding the impact of accumulated other comprehensive income (AOCI))

- Record net revenues of $243.7 million, an increase of 50% above $162 million for the third quarter of 2003

- Record capital markets revenues of $164.4 million, up 51% versus the same period in 2003

- FBR's first book running lead managed asset-backed securities (ABS) underwriting totaling approximately $720 million.

Nine months ended September 30, 2004:

- Net earnings up 116% to a record $263 million, compared to $121.5 million for the first nine months of 2003

- Earnings per share (diluted) were up 41% to a record $1.56, compared to $1.11 for the first nine months of 2003

- A return on equity of 22.6% (22.8% excluding the impact of OCI)

- A 90% increase in net revenues to a record $642.8 million versus $338.6 million for the first nine months of 2003

- Record capital markets revenues of $379.1 million, up 98% versus the same period in 2003

"During the third quarter our capital markets businesses exhibited significant growth, even with a choppy market early in the period. Simultaneously, we were able to manage our more predictable spread-based business to yield appropriate returns in spite of a flattening yield curve," said Eric F. Billings, Co-Chairman and Co-Chief Executive Officer.

On September 9, 2004, FBR declared a quarterly regular dividend of $0.34 per share, to be paid on October 29, 2004. The company earned a total of $263 million during the first nine months of 2004, or $1.56 per share (diluted), and declared $1.14 per share of total dividends.

32.   On November 9, 2004, FBR filed its third quarter 2004 Form 10-Q in which it

disclosed an SEC and NASD investigation into its broker-dealer subsidiary FBR & Co.:

Friedman, Billings, Ramsey & Co., Inc. ("FBR & Co") is involved in investigations by the SEC and the NASD concerning its role in 2001 as a placement agent for an issuer in a PIPE (private investment in public equity) transaction. The Company has cooperated fully with the investigations. To date, neither the SEC nor the NASD has initiated proceeding against the Company or its employees in connection with the investigations.

In addition, one of the Company's investment adviser subsidiaries, Money Management Associates, Inc. ("MMA") and one of its now closed mutual funds, are involved in an investigation by the SEC with regard to certain losses sustained by the fund in 2003.  The Company has cooperated fully with the investigation.  To date, the SEC has not initiated proceedings against the Company or its employees in connection with the investigation.

Since no proceedings have been initiated in these investigations, it is inherently difficult to predict the outcome of the investigations or their affect on FBR & Co., MMA or the Company.  Either or both agencies may initiate proceeding as a result of the investigations and such proceedings could result in adverse judgments, injunctions, fines, penalties or other relief against the Company or one or more of its employees.

33.    TheStreet.com reported on November 10, 2004:

A 10-month regulatory investigation into the murky world of private placements and hedge funds might have found its first target in Friedman Billings Ramsey.

The Arlington, VA., investment firm disclosed late Tuesday that the Securities and Exchange Commission and the NASD are jointly investigating the firm's role as the placement agent for a private stock deal in 2001.

This spring, the SEC issued subpoenas and requests for documents to 20 brokerages that have arranged so-called PIPE deals - - private placements in public equity - - for cash-strapped companies.  Regulators subsequently issued subpoenas to about 10 hedge funds, seeking information about their trading activity in certain PIPE transactions.

Friedman is the first Wall Street firm to publicly acknowledge that regulators are scrutinizing its role as a PIPE placement agent.  Shares of the securities firm fell 64 cents, or 3.6%, to $16.95, on the news.

The investigation into the $14 billion PIPEs market is focusing on allegations of stock manipulation by hedge funds, which tend to be the biggest investors in these shadowy stock sales.  PIPEs are popular with hedge funds because the buyers can get preferred stock or bonds that convert into shares at a discount to market prices.  The deals often include sweeteners, such as warrants, that permit the private investors to buy additional shares at prices well below what ordinary investors would pay for them.

34.    On this news, FBR's stock dropped to $16.93 per share, some 40% lower than the

Class Period high of $28.70 per share.  However, market observers were unaware of the seriousness

of the investigation and FBR stock continued to trade at artificially inflated levels.

35.     On February 9, 2005, FBR announced "record" financial results for 2004.  The

release stated in part:

> During the fourth quarter 2004, net after-tax income was $86.6 million, or
> $0.51 per share (diluted), compared to $80.0 million, or $0.49 per share (diluted), in
> the final quarter of 2003.  Net revenues for the quarter were $245.1 million, an
> increase of 11.0%.

*     *     *

> "During 2004 we achieved an industry leading ROE of 22.3% despite using
> the lowest level of leverage of any comparable capital markets company.  What is
> particularly significant is that we achieved these results while making really
> substantial investments in our existing platform," said Eric F. Billings, Co-Chairman
> and Co-Chief Executive Officer.  "We increased our headcount by more than 40%,
> we undertook expansions or relocations in six of our 16 offices, we expanded our
> asset-backed securities (ABS) banking unit, and took a major step toward building
> better brand awareness through advertising, conferences, and our ongoing
> sponsorship of the FBR Open.  In addition, early in 2005 we created a fixed-income
> securities trading group and entered into an agreement to acquire First NLC Financial
> Services, LLC (FNLC), a rapidly growing non-conforming mortgage lender.  We
> expect that the positive impact of all these steps will be seen in future earnings as we
> reposition our mortgage portfolio to include non-conforming mortgages and as we
> broaden and grow our capital markets businesses.  The effect of these new initiatives
> combined with the strength of our historical business makes us very optimistic about
> our prospects for growth in 2005 and beyond."

*     *     *

> "We are pleased with the results of our investment banking business.  Our
> strategy to grow this business by adding talented bankers to our unique capital
> markets platform has proven effective.  Our 2004 results also reflect our success in
> maintaining client relationships while expanding our client base into new areas.  In
> particular, we are excited about our success with financial sponsor groups in 2004
> and believe this will be an area of continued growth for us in 2005," said Emanuel J.
> Friedman, Co-Chairman and Co-Chief Executive Officer.

36.     On February 16, 2005, FBR announced the completion of the acquisition of First

NLC Financial Services, LLC, an affiliate of Sun Capital Partners and a non-conforming mortgage

originator.  The release stated:

> FBR had previously announced that it would pay $88 million in cash and
> stock for 100% of the equity interests of First NLC.  The adjustment in purchase
> price is the result of an $11 million increase in the tangible net worth of the seller at

- 18 -

closing and more than $100 million of additional loans on the seller's balance sheet at closing.  The net purchase price in excess of tangible equity acquired was $74 million.  At closing, FBR acquired a mortgage portfolio of approximately $475 million.

37.    On April 4, 2005, FBR announced its Chairman, CEO and namesake was stepping down.  The release stated:

> Friedman, Billings, Ramsey Group, Inc., a leading national investment bank, today said that Emanuel J. Friedman, 58, has announced he will retire from his roles as Co-Chairman and Co-Chief Executive Officer of FBR, member of the firm's Office of the Chief Executive, and director, effective June 9, 2005, the date of the firm's annual meeting of shareholders.  Mr. Friedman co-founded FBR in 1989 with Eric Billings and Russell Ramsey.

38.    This announcement finally apprised the market of the seriousness of the NASD and SEC investigations.  On April 5, 2005, FBR's stock collapsed to $13.97 on volume of 10.6 million shares.

39.    Then, on April 25, 2005, FBR announced preliminary results for the first quarter 2005 in a release which stated in part:

> Friedman, Billings, Ramsey Group, Inc. today announced preliminary financial results for the quarter that ended March 31, 2005.  FBR expects to report net after-tax income of $22 million to $25 million, or $0.13 to $0.15 per share (diluted).  FBR expects to report net revenues for the quarter of $163 million compared to $221 million for the first quarter 2004.  Included in these results is a reserve of $7.5 million for a potential settlement by the company's broker-dealer subsidiary related to a previously disclosed regulatory investigation concerning a PIPE transaction completed in 2001.  Book value per share as of March 31, 2005 is anticipated to be $8.62, and book value per share net of Accumulated Other Comprehensive Income (AOCI) is expected to be $9.63.

> "While our first quarter results were clearly disappointing, we remain optimistic about our capital markets and principal investment portfolio businesses, and we remain confident that we will generate the earnings to maintain our core dividend payments," said Eric F. Billings, Co-Chairman and Co-Chief Executive Officer of FBR.

> "As we discussed in our conference call on March 17, this quarter was negatively impacted by a lack of merchant banking gains, one-time transitional costs related to the acquisition of First NLC, and continuing spread compression in the mortgage-backed securities (MBS) portfolio," Mr. Billings said. "The principal

reasons for the lower reported earnings following the call are the previously
mentioned reserve for the PIPE transaction and related legal fees, anticipated
revenues from an investment banking transaction and dividends from merchant
banking which shifted from the first quarter into the second quarter. The banking
transaction has subsequently been completed and the anticipated dividends have been
declared."

40.     On this news, FBR stock collapsed to $12.52 per share on volume of 7.5 million

shares.

41.     Later, on April 26, 2005, FBR announced a proposed settlement with the SEC and

NASD in a release which stated in part:

> Friedman Billings Ramsey Group, Inc. announced today that its broker-dealer
> subsidiary FBR & Co., Inc. ("FBR & Co." or "the company") has made an offer of
> settlement to the staff of the Division of Enforcement ("SEC staff") of the Securities
> and Exchange Commission ("Commission") and the staff of the Department of
> Market Regulation of NASD ("NASD staff"), and the company has requested the
> SEC and NASD staffs recommend such proposal to the Commission and NASD
> National Adjudicatory Council or NASD Office of Disciplinary Affairs, respectively,
> pending final negotiation of the settlement language, to resolve ongoing, previously
> disclosed investigations by the SEC and NASD staffs. The proposed settlement
> concerns insider trading and other charges concerning the Company's trading in a
> company account and the offering of a private investment in public equity ("PIPE")
> on behalf of CompuDyne, Inc. ("CDCY") in October 2001.
>
> Following discussions with both the SEC and NASD staffs, the company
> made an offer of settlement in order to resolve this matter. In the SEC proceeding,
> the company, without admitting or denying any wrongdoing, offered to pay
> disgorgement, civil penalties, and prejudgment interest totaling approximately $3.5
> million and to consent to the entry of a permanent injunction with respect to
> violations of the antifraud provisions of the federal securities laws. The company
> also agreed to consent to a administrative proceeding under Section 15(b) of the
> Securities Exchange Act of 1934 in which the company would be subjected to a
> censure and would agree to certain undertakings, including review by an independent
> consultant of its Chinese Wall procedures and implementation of any recommended
> improvements. . . .
>
> In the parallel NASD proceeding, based upon the same circumstances
> described above, the company will submit a Letter of Acceptance, Waiver and
> Consent ("AWC"), pending final negotiation of appropriate language, proposing a
> settlement of alleged violations of the antifraud provisions of the federal securities
> laws and NASD Rules 2110, 2120, 3010 and 3370. The Company will also agree to
> the same undertakings provided for in the proposed settlement with the SEC,
> including agreeing to an independent consultant to review its Chinese Wall

procedures and implementing any recommended improvements, and FBR & Co. offered to pay a fine of $4 million to NASD.  The AWC must be reviewed and accepted by NASD's Department of Market Regulation and National Adjudicatory Council or the Office of Disciplinary Affairs.  The proposed settlement of the proceedings and the injunctive actions is subject to the Company obtaining relief from certain statutory disqualifications, which result from the entry of the injunction and findings of violations in the proceedings.  Any relief from the statutory disqualifications must be reviewed and approved by the Commission, and the SEC staff can make no assurance that any or all of the requested relief will be granted by the Commission.  FBR has recorded a $7.5 million chart in its 2005 first quarter with respect to the offer of settlement to the SEC and the AWC to NASD.

Three individuals, including Emanuel J. Friedman, who recently announced is retirement as Co-Chairman and Co-Chief Executive Officer of FBR and is no longer involved in the operations of the broker-dealer, are in discussions with the staffs of the SEC and NASD regarding this matter.  The other two individuals in discussions with the regulators were the company's head trader and chief compliance officer. Both the head trader and chief compliance officer have retired from the company. The company has named their replacements.

42.     On May 3, 2005, FBR stock dropped to below $11 per share.  The true facts, which were known to each of the defendants during the Class Period but were concealed from FBR's shareholders, include:

(a)     The 2001 PIPE transaction manipulation was extremely serious and reached the highest level of the Company;

(b)     FBR's earnings would be adversely affected by charges related to the investigation into the PIPE transaction and due to the problems the bad publicity would cause FBR; and

(c)     FBR's 2005 EPS would be much worse than market expectations due to the PIPE transaction as well as due to interest rate increases which would have a much more severe impact on FBR's business than defendants had represented to the market.

**LOSS CAUSATION/ECONOMIC LOSS**

43.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated FBR's stock price and operated

- 21 -

as a fraud or deceit on Class Period purchasers of FBR stock by misrepresenting the Company's financial results, business success and future business prospects, and concealing the extent and seriousness of manipulations involving the 2001 PIPE transaction. Defendants achieved this façade of success, growth and strong future business prospects by blatantly concealing the fraudulent conduct and misrepresenting FBR's business. Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, FBR stock fell precipitously as the prior artificial inflation came out of FBR's stock price. As a result of their purchases of FBR stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

44.     By improperly concealing its conduct, the defendants presented a misleading picture of FBR's business and prospects. Thus, instead of truthfully disclosing during the Class Period that FBR's business was not as healthy as represented, defendants caused FBR to conceal its violation of SEC and NASD rules. During the Class Period, defendants repeatedly emphasized FBR's "franchise and brand name" which would lead to enhanced future results.

45.     These claims of "brand name" improvement caused and maintained the artificial inflation in FBR's stock price throughout the Class Period and until the truth was revealed to the market.

46.     Concurrent with the concealment of the improprieties by high level FBR officials, defendants also misled investors by asserting that the "strengths of [its] business model" were allowing favorable results even in a difficult business environment.

47.     Defendants' false and misleading statements had the intended effect and caused FBR stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $28.70 per share.

48.     On April 4, 2005, defendants were forced to publicly disclose that defendant Friedman was resigning.  On April 25, 2005, defendants had to admit that FBR's first quarter financial results would be much worse than prior representations and that it has recorded a charge related to the PIPE transaction.  These public revelations indicated the seriousness of the PIPE manipulations, that FBR had failed to achieve the brand name improvement represented and thus that the Company's prospects for business success and earnings growth for 2005 and beyond were severely diminished.  As investors and the market became aware of these issues, the prior artificial inflation came out of FBR's stock price, damaging investors.

49.     As a direct result of defendants' admissions and the public revelations regarding the truth about FBR's previously reported financial results and its actual business prospects going forward, FBR's stock price plummeted 37%, falling from $19.28 in early March 2005 to $11.04 per share on May 3, 2005, a drop of $8.24 per share.  This drop removed the inflation from FBR's stock price, causing real economic loss to investors who had purchased the stock during the Class Period. Analysts following the Company were shocked by these adverse revelations, with Barron's reporting:

> You know the good times are over when the costs of sponsoring a golf tournament put your earnings in the rough.
>
> But that's about the least of the worries lately for ***Friedman, Billings Ramsey Group***.  Joined at the hip to the volatile mortgage-securities sector, FBR's fundamentals have weakened markedly as interest rates have moved higher and margins on its mortgage portfolio have narrowed.
>
> FBR, a small Arlington, VA.-based investment bank that merged a few years ago with its leveraged mortgage-securities-based real estate investment trust . . . is now paying the price as the yield curve flattens and its spreads tighten.
>
> Moreover, an ongoing government probe into insider trading and activities surrounding the firm's role in managing a private sale of ***CompuDyne*** stock in 2001 has led to the recent abrupt departure of Emanual [sic] "Manny" Friedman, a Talmudic scholar who had been co-chairman and co-chief executive along with Eric

Billings.  Billings remains a sole chairman and chief executive.  The head trader and chief of compliance also have left the firm as a result of the same investigation.

Meanwhile, FBR last week forecast first-quarter net income of $22 million to $25 million, or 13 cents to 15 cents a share, less than half the 31 cents a share Wall Street had been expecting, and sharply down from the 54 cents a share the firm earned in the year-ago quarter.  Revenue is projected to be $163 million, compared with $221 million in the year-ago period.

FBR blamed a lack of merchant-banking gains, costs related to its February acquisition of First NLC, a subprime residential-mortgage lender, and compressed spreads in its mortgage-backed-securities portfolio.  Expenses associated with its sponsorship of the FBR Open, a PGA tournament held in Scottsdale, Ariz., also hurt results.  That's despite charging FBR's guests at the tournament $5,000 to play a round with pro Phil Mickleson or $850 for a gift bag filled with golf balls.

And in a bid to put the taint of the investigation behind it, FBR last week made the unusual move of offering to settle with the Securities and Exchange Commission and the National Association of Securities Dealers and announced its own terms.  The company offered to pay $7.5 million in fines, which it plans to charge against first-quarter earnings.

In the SEC case, FBR offered to pay about $3.5 million in disgorgement, civil penalties and prejudgment interest.

Without admitting or denying any wrongdoing, the firm also said it would consent to a permanent injunction based on violations of the antifraud provisions of federal securities laws.

In addition, the company also agreed to a censure proceeding that would result in an independent review of its so-called Chinese Wall provisions that are designed to prevent leaks of inside information that could lead to conflicts of interests.

FBR also offered to settle the alleged violations of the federal antifraud provisions with the NASD and offered to pay $4 million in fines to that agency.

Amid the tumult, a few weeks ago the firm fired one of its highest-profile faces, telecommunications analyst Susan Kalla in a separate matter, charging she failed to comply with internal policies and procedures related to trading activity and disclosures.  Kalla denies the charges.

Interestingly, the very chief compliance officer who accused Kalla of violating firm policy left the firm two weeks later in connection with the ongoing insider-trading probe, but not before installing his two sons in FBR's compliance department.  (An inside joke at the firm is that FBR stands for "Friends, Brothers & Relatives," a reference to the firm's long-standing clanish employment practices.)

- 24 -

Closing trading for the week at $12.09 a share, FBR stock is off about 36% so far this year. That's also a 52-week low and down sharply from its 52-week high of 22.

Even at current levels, some observers think it may have further to go.

50.     In sum, as the truth about defendants' fraud and FBR's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of up to $8.24 per share.

51.     The 37% decline in FBR's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of FBR's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  During the same period in which FBR's stock price fell 37% from $19.28 per share as a result of defendants' fraud being revealed, the Standard & Poor's 500 securities index was essentially flat.  The economic loss, i.e., damages, suffered by plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate FBR's stock price and the subsequent significant decline in the value of FBR's stock when defendants' prior misrepresentations and other fraudulent conduct was revealed.

### FIRST CLAIM FOR RELIEF

#### For Violation of §10(b) of the Exchange Act
#### and Rule 10b-5 Against All Defendants

52.     Plaintiff incorporates ¶¶1-51 by reference.

53.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in

that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of FBR common stock during the Class Period.

55.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FBR common stock.  Plaintiff and the Class would not have purchased FBR common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

56.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of FBR common stock during the Class Period.

**SECOND CLAIM FOR RELIEF**

**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

57.     Plaintiff incorporates ¶¶1-56 by reference.

58.     The executive officers of FBR prepared, or were responsible for preparing, the Company's press releases and SEC filings. The Individual Defendants controlled other employees of FBR. FBR controlled the Individual Defendants and each of its officers, executives and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of FBR during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FBR securities were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by FBR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

- 27 -

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of FBR; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive or other relief as the Court may deem proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: May 11, 2005

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
DAVID A. ROSENFELD (DR-7564)

_____
SAMUEL H. RUDMAN

200 Broadhollow Road, Suite 406
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
401 B Street, Suite 1600
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

SCOTT + SCOTT, LLC
DAVID R. SCOTT
NEIL ROTHSTEIN
108 Norwich Avenue
Colchester, CT  06415
Telephone:  860/537-3818
860/537-4432 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Friedman-Billings.doc