UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/08

IN RE FBR INC. SECURITIES LITIGATION

05 Civ. 4617 (RJH)
(MASTER FILE)

**MEMORANDUM OPINION
AND ORDER**

Plaintiffs bring this consolidated class action on behalf of all purchasers of the

securities of Freidman, Billings, Ramsey Group, Inc. ("FBR") between January 29, 2003

and April 25, 2005 against defendants FBR, and three of its officers and directors,

Emanuel J. Friedman, Eric F. Billings, and Kurt R. Harrington (the "Individual

Defendants"). Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5

promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants have moved to dismiss the

consolidated amended complaint (the "Complaint") pursuant to Rules 12(b)(6) and 9(b)

of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants'

motion is granted. Plaintiffs, however, are granted leave to move to further amend their

complaint.

**BACKGROUND**

FBR is a publicly traded investment bank that provides investment banking,

institutional brokerage, and asset management services, and that invests as a principal in

mortgage-backed securities and merchant-banking investments. (Compl. ¶ 2.) Plaintiffs

claim that defendants made, or controlled others who made, materially false and

misleading statements and omissions concerning FBR's involvement in and potential liability for improprieties arising out of FBR's provision of certain investment banking services to CompuDyne Corporation ("CompuDyne") in the fall of 2001. (*Id.* ¶¶ 2, 5.)

## I.    The CompuDyne PIPE Offering

In September 2001, CompuDyne retained FBR to underwrite what is known as a PIPE offering. (*Id.* ¶ 27.) PIPE stands for private investment in public equity, and refers to an arrangement in which the "underwriter or placement agent privately places restricted securities of a public company with accredited investors," often at a substantial discount. (*Id.* ¶¶ 2–3, 59.) As part of the placement, the issuer agrees that within a set period of time it will file a resale registration statement with the SEC. (*Id.* ¶ 3.) PIPE investors are not obligated to pay for the purchased shares until shortly before the SEC declares that the resale registration statement is effective. (*Id.*) However, shares obtained in a PIPE offering may not be sold until after the resale registration is effective. (*Id.*) Here, FBR marketed a PIPE offering of CompuDyne's common stock to prospective purchasers, promising a substantial discount from the market price. (*Id.* ¶ 27.) FBR advised potential investors that the fact of the PIPE offering was confidential, non-public information and circulated a Confidential Private Placement Memorandum that further emphasized that the PIPE offering was confidential. (*Id.* ¶¶ 27–28.) On October 8, 2001, the CompuDyne PIPE offering was priced at $12 per share, a significant discount from CompuDyne's closing price of $17.38. (*Id.* ¶ 29.) The next day, CompuDyne and FBR announced the completion of the PIPE offering, which is alleged to have caused (not unexpectedly) the price of CompuDyne stock to decline. (*Id.* ¶ 30.) After the market

2

closed on October 29, 2001, the SEC declared the resale registration statement for the CompuDyne PIPE offering effective. (*Id.* ¶ 31.)

Plaintiffs allege that the "CompuDyne PIPE offering was beset by insider trading and other violations of the securities laws" as purchasers "sold short CompuDyne common stock prior to the announcement of the CompuDyne PIPE offering and then covered their short sales with the CompuDyne Stock that they had purchased in the PIPE offering." (*Id.* ¶ 32.) These activities are alleged to have constituted insider trading and the unregistered sale of CompuDyne stock. (*Id.*) Defendants' involvement in this scheme is alleged as follows:

> Defendants and at least two other high level FBR executives, Scott Dreyer, head of trading at FBR, and Nicholas Nichols, FBR's chief compliance officer, knew of the improper insider trading and unregistered securities sales that was occurring in connection with the CompuDyne PIPE offering and provided those engaged in the improper trading with substantial assistance, thereby aiding and abetting them in their violations of the federal securities laws.

(*Id.* ¶ 33.) As support for this claim, plaintiffs point to allegations in the Complaint that FBR subsequently made an offer of settlement to the SEC and NASD concerning "insider trading and other charges concerning [FBR's] trading in a company account and the [CompuDyne PIPE] offering" and that FBR reported that Friedman, Dreyer, and Nichols had retired from the company and were themselves in discussions with the SEC and NASD. (*Id.* ¶ 69; Pls.' Opp'n 17–18.)[1] The Complaint also notes that two hedge fund managers settled charges brought by regulators alleging insider trading violations in

---

[1] While this motion was pending, defendants submitted evidence that the SEC and NASD had accepted FBR's offers to settle. (Borden Letter at 1, Dec. 22, 2006.) The SEC filed a complaint alleging violations of the securities laws by FBR, defendant Friedman, and non-defendant Nicholas Nichols. (Borden Letter, Ex. B, Dec. 22, 2006.) The NASD accepted a letter of Acceptance, Waiver and Consent ("AWC") submitted by FBR, Friedman, and Nichols, which included NASD's findings of violations of the securities laws and NASD Conduct Rules. (Borden Letter, Ex. A, Dec. 22, 2006.) The Court does not consider these documents as part of the record before it, except as they relate to its decision to allow plaintiffs leave to move to amend their complaint.

connection with the CompuDyne PIPE offering. (Compl. ¶¶ 61, 71–72.) One of the hedge fund managers, John Mangan was "managing a group of proprietary hedge funds for FBR." (*Id.* ¶ 72.)

## II.    The Alleged False and Misleading Statements and Omissions

The Complaint alleges that between January 29, 2003 and August 9, 2004, defendants made false and misleading statements and omissions in end-of-quarter press releases and SEC filings. The Complaint identifies allegedly misleading statements in each of the seven quarterly press releases, five Quarterly Reports ("10-Qs"), and two Annual Reports ("10-Ks") that FBR issued during this time period. The allegedly misleading statements from the press releases are, essentially, of two kinds: (1) financial data reflecting FBR's profitability in the preceding quarter; and (2) positive assessments of the past and future strength of FBR's investment banking business. (*Id.* ¶¶ 35, 38, 41, 45, 48, 51, 54.) Plaintiffs allege that the 10-Ks include two more categories of misleading statements as they describe (1) the existence of FBR's "corporate wide risk management program" and (2) the general risks associated with "extensive government regulation" of the securities business. (*Id.* ¶¶ 36, 49.) Finally, in the five 10-Qs and both 10-Ks, plaintiffs specify a fifth kind of misleading statement: certifications signed by the individual defendants that they had disclosed to auditors "any fraud . . . that involves management or other employees who have a significant role in the registrant's internal control[] [over financial reporting]."[2]  (*Id.* ¶¶ 36, 39, 42, 46, 49, 52, 55.)

---

[2] The Complaint replaces "over financial reporting" with an ellipsis in its recitation of the certification statements. (*Compare*, Compl. ¶ 49 (reciting language of certification from FBR's 2003 10-K and omitting "over financial reporting") *with* FBR, Annual Report (Form 10-K), Exs. 31.01–.03 (Mar. 15, 2004) (including "over financial reporting").) The Complaint omits, without note of an alteration, that the

4

Plaintiffs contend that all of the specified statements were misleading or false

because defendants did not disclose:

> (a) that FBR, Friedman and other FBR executives had participated in the CompuDyne PIPE offering and in connection therewith aided and abetted certain purchase [sic] in the offering with their violations of the federal securities laws;
>
> (b) [that] given Friedman's direct involvement in the improper trading surrounding the CompuDyne PIPE offering, the legal, regulatory and reputational risks facing FBR were much more pronounced and definitive. In other words, the risks facing FBR were far more serious because Friedman, the Company's CEO and founder, would be directly at risk should the true facts about the CompuDyne PIPE offering be discovered;
>
> (c) [that] FBR lacked an effective compliance program as evidenced by the fact that its CEO and founder, Friedman, and its chief compliance officer, Nicholas [sic], were involved in, and aided and abetted violations of the federal securities laws in connection with the CompuDyne PIPE offering; and
>
> (d) [that] Defendants Friedman, Billings and Harrington falsely represented that they had disclosed "any fraud" that "involves management" to the FBR audit committee or its auditors, but they had not disclosed the CompuDyne PIPE Trading Scheme.

(*Id.* ¶ 37; *see also id.* ¶¶ 40, 43, 47, 50, 53, 56, 59.) In sum, the Complaint alleges that

FBR's failure to disclose the above facts created "an unrealistically positive assessment

of FBR and its business and operations, thus causing the Company's securities to be

overvalued and artificially inflated . . . ." (*Id.* ¶ 76.)

## III.    FBR Discloses the Existence of the SEC and NASD Investigations

On November 9, 2004, FBR disclosed that the SEC and NASD were investigating

FBR's role in a 2001 PIPE offering. (*Id.* ¶ 58.) FBR represented that it "ha[d]

---

certifying officers' representations are "based on [their] most recent evaluation *of internal control over financial reporting.*" *Compare, e.g.*, Compl. ¶ 49 (omitting italicized text) *with* FBR, Annual Report (Form 10-K), Exs. 31.01–.03 (Mar. 15, 2004) (including italicized text).

cooperated fully with the investigations," and noted that "[t]o date, neither the SEC nor
the NASD has initiated proceeding[s] against the Company or its employees in
connections with the investigations." (*Id.*) FBR cautioned, however, that any
proceedings "could result in adverse judgments, injunctions, fines, penalties or other
relief against the Company or one or more of its employees." (*Id.*) According to an
online news report, FBR's stock price fell 3.6% on the news. (*Id.* ¶ 59.) On April 4,
2005, FBR revealed that defendant Friedman, the company's eponymous co-chairman
and co-CEO, was resigning from FBR at age 58, effective June 9, 2005. (*Id.* ¶ 64.) The
financial press suggested that Friedman's resignation was connected with the regulatory
investigations. (*Id.* ¶ 65.) FBR's share price declined 10% on heavy trading. (*Id.* ¶ 66.)
On April 25, 2005, FBR reported diminished earnings for the first quarter of 2005, in part
due to the creation of a $7.5 million reserve for settlement of the SEC and NASD
investigations of the CompuDyne PIPE offering. (*Id.* ¶ 67.) Again, the price of shares in
FBR dropped significantly. (*Id.* ¶ 68.) The next day, April 26, 2005, FBR announced
that it had proposed settlements to the SEC and NASD that would require FBR to pay
$7.1 million in total fines. (*Id.* ¶ 69.)

# DISCUSSION

## I.    Pleading Standard

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept as
true all of the factual allegations in the complaint and draw all reasonable inferences in
the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.
2007). In so doing, the court need not "accord legal conclusions, deductions or opinions

6

couched as factual allegations a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotations and alterations in original omitted). Indeed, to survive a motion to dismiss, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI*, 493 F.3d at 98 (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).

Claims of securities fraud are subject to heightened pleading requirements imposed by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. *See ATSI*, 493 F.3d at 99. Rule 9(b) requires that the "circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). Thus, the Second Circuit has instructed that a "securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. Similarly, the PSLRA requires that a complaint alleging misleading statements or omissions "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). For securities claims dependent on a pleading of scienter, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2). The Supreme Court has recently instructed that a complaint should survive a motion to dismiss "only if a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510 (2007).

## II. Section 10(b) and Rule 10b-5

Promulgated under authority granted to the SEC by Section 10 of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

Under Rule 10b-5, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 234 (U.S. 1980). A corporation does not have a duty to disclose information simply because it is material, *see Glazer v. Formica Corp.*, 964 F.2d 149, 156 (2d Cir. 1992) ("Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it.") (internal quotations omitted), or because it suggests that the corporation or its employees engaged in uncharged illegal conduct, *see In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws

8

do not require a company to accuse itself of wrongdoing."); *Menkes v. Stolt-Nielsen S.A.*, No. 03 Civ. 409, 2005 U.S. Dist. LEXIS 28208, at \*21 (D. Conn. Nov. 10, 2005) ("[T]he fact that a corporation's employees engaged in illegal conduct may well be material to the reasonable investor for several obvious reasons, but the obligation to disclose uncharged illegal conduct does not arise from the materiality of this information alone."). However, "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (quoting *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987)).

Here, plaintiffs claim that defendants' statements were false or misleading because they did not disclose the four "material adverse facts" cited above: (1) that FBR knowingly provided substantial assistance to those engaged in insider trading of CompuDyne stock; (2) that Friedman's involvement in the insider trading scheme meant that it posed a greater risk to FBR's future success; (3) that FBR did not have an effective compliance program because the insider trading scheme occurred; (4) that the individual defendants did not disclose FBR's involvement in the insider trading of CompuDyne stock to FBR's auditors. The Court first addresses whether plaintiffs have alleged the fraud underlying these material adverse facts with sufficient particularity.

## A. Pleading the Undisclosed Insider Trading Scheme with Particularity

Rule 9(b) applies to "all averments of fraud." Fed. R. Civ. P. 9(b). "This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (holding that "Rule 9(b)

9

applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud"); *see also Black's Law Dictionary* 131–32 (7th ed. 1999) (defining averment as a "positive declaration or affirmation of fact; esp., an assertion or allegation in a pleading"). "Fraud allegations may damage a defendant's reputation regardless of the cause of action in which they appear, and they are therefore properly subject to Rule 9(b) in every case." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003) (quoted in *Rombach*, 355 F.3d at 171). The Ninth Circuit has instructed that "if particular averments of fraud are insufficiently pled under Rule 9(b), a district court should 'disregard' those averments, or 'strip' them from the claim." *Id.*

Here, the essential predicate for all of plaintiffs' claims is the allegation that FBR knowingly provided substantial assistance to an illegal insider trading scheme that violated the securities laws. "Insider trading . . . is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b), not the liberal notice-pleading standard of Rule 8(a)." *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910 (GEL), 2005 U.S. Dist. LEXIS 26942, at \*33 (S.D.N.Y. Nov. 4, 2005). Thus, in order to state a claim that defendants violated the securities laws because they failed to disclose the insider trading scheme, plaintiffs must plead the alleged trading scheme with particularity.[3] *Cf. In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) ("If the complaint fails to allege facts which would establish such an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.") (emphasis in original).

---

[3] Plaintiffs do not dispute that Rule 9 and the PSLRA require that the circumstances surrounding this underlying fraud be pleaded with particularity. (Pls.' Opp'n 17–18.)

10

While the Complaint alleges some facts suggesting that FBR did *something* wrong in connection with the CompuDyne PIPE transaction, it alleges no facts that support its conclusory allegation that Friedman and other FBR executives *knowingly provided substantial assistance* to those engaged in insider trading of CompuDyne stock. Rather the Complaint alleges (1) that individuals other than Friedman or FBR executives[4] committed insider trading violations, (2) that in response to an investigation into FBR's role as the underwriter of the CompuDyne PIPE offering, FBR, Friedman and two other FBR executives were seeking a settlement with the SEC and NASD. Absent from the Complaint is *any* indication of how defendants could have knowingly provided substantial assistance to those who committed insider trading violations. Rather, as the Complaint concedes, it was not improper for FBR to disclose to potential PIPE investors the material, non-public information that was traded on, and FBR alerted investors to the potential impropriety of trading CompuDyne stock based on their knowledge of the PIPE offering. (Compl. ¶¶ 27–28.)

Plaintiffs' allegations suffer from a similar opacity as to whom defendants are alleged to have provided substantial assistance. The Complaint identifies two individuals who allegedly committed insider trading violations, one of whom managed FBR's proprietary hedge fund, but it also alleges without apparent support that the PIPE offering was "beset by insider trading and other violations of the securities laws" and that "numerous [PIPE] purchasers" shorted CompuDyne stock before the PIPE offering was announced. (*Id.* ¶ 32.) The Court is left to guess whether plaintiffs are claiming that defendants knowingly provided substantial assistance to the "numerous purchasers" who

---

[4] While the Complaint alleges that John Mangan, a manager of proprietary hedge funds, settled NASD charges for improper trading of CompuDyne stock, it includes no allegations about the relationship between defendants and Mangan.

allegedly committed insider trading violations and, if so, on what circumstances plaintiffs base this belief.

In sum, while the Complaint alleges the nature of defendants' violation of the securities laws, it does not specify what defendants did, who they did it with, or how what defendants did constituted the alleged violation. Securities plaintiffs cannot meet the heightened pleading standards imposed by Rule 9 and the PSLRA with such conclusory claims of undisclosed wrongdoing. *See Axis*, 456 F. Supp. 2d at 586 ("[P]laintiffs' bald allegations of a scheme to drive other insurance companies from the market are far too conclusory to satisfy the requirements of Rule 9 and the PSLRA."); *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632 (S.D.N.Y. 2005) (finding that plaintiffs' claim that defendants failed to disclose an illegal kickback scheme was not pleaded with sufficient particularity as plaintiffs provided "no particular factual allegations that support the conclusory assertion that these investment opportunities were provided as 'kickbacks,' let alone that these opportunities were offered with fraudulent intent"). Plaintiffs' failure to properly plead the wrongdoing that they allege defendants were obligated to disclose is fatal to both their Section 10 and Section 20 claims. In light of the SEC complaint and the NASD's AWC, it appears that plaintiffs will likely be able to remedy the present Complaint's failure to allege the undisclosed fraud with particularity. Nevertheless, for the reasons that follow, plaintiffs' complaint would be deficient even if they had properly pleaded defendants' involvement in the alleged insider trading scheme. In the event that plaintiffs move to further amend their complaint, those deficiencies must be addressed.

**B.  Whether Defendants Made Materially False or Misleading Statements**

As noted above, the Complaint alleges that defendants made five sorts of

actionable statements: (1) reports of historical financial data, (2) qualitative assessments

of the strength of FBR's business, (3) descriptions of the organization and objectives of

FBR's risk management program, (4) boilerplate recitations of risks facing FBR arising

out of the extensive regulation of the securities business, and (5) certifications by the

individual defendants that they had disclosed frauds to FBR's auditors.  The Court finds

that, even assuming proper pleading, the first four sets of statements were not false or

misleading as a matter of law.  With regard to the Sarbanes-Oxley certifications, in light

of an additional pleading error, the Court does not reach whether the certifications could

have been false or misleading.

**1.  Reports of Historical Financial Data**

The seven end-of-quarter press releases each report FBR's earnings.  (Compl. ¶¶

35, 38, 41, 45, 48, 51, 54.)  By the end of the class period, earnings per share had sunk

from a high of $0.54 (first quarter of 2004) to between $0.13 and $0.15 (first quarter of

2005).  (*Id.* ¶¶ 51, 67.)  The Complaint does not allege that FBR's reports of its quarterly

earnings and other related historical financial information were themselves false in any

way.  Nor does the Complaint allege that the earnings reports that plaintiffs challenge as

misleading bore any material relation to the CompuDyne PIPE offering itself.[5]  This is

unsurprising as the PIPE offering occurred in October 2001 and the earliest results

alleged to be misleading by the Complaint are those for the fourth quarter of 2002.  (*Id.*

¶¶ 29–32, 35.)  Moreover, it is not alleged that FBR's reported earnings before, during, or

---

[5] Plaintiffs' claim in their opposition papers that FBR's record annual results "were made possible in part by [defendants'] misconduct in the CompuDyne Pipe Trading Scheme" does not appear to have any basis in the allegations appearing in the Complaint.  (Pls.' Opp'n 16.)

after the class period were substantially buoyed by gains derived improperly from the insider trading scheme.

*Accurate* statements of past earnings figures are not themselves actionable under Section 10(b). *See, e.g.*, *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 U.S. Dist. LEXIS 21319, at *23 (S.D.N.Y. Nov. 24, 2003) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.") (internal quotations omitted) *aff'd sub nom Nadoff v. Trahan*, 107 Fed. Appx. 250 (2d Cir. 2004) ("Accurate statements about past performance are self-evidently not actionable under the securities laws . . . ."). There does appear to be some debate within this Circuit as to whether statements that put the sources of stated revenue at issue without revealing their actual improper source can render the reports of revenue themselves actionably misleading.[6] *See In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 470 (S.D.N.Y. 2006) (noting that the decision in *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) may be read to suggest such a result). While this Court finds Judge Kram's rejection of this possibility convincing, *see id.* at 470–71, it need not reach the question here as the Complaint does not allege that any of defendants' statements put the source of FBR's revenue from the fourth quarter of 2001 at issue or that FBR's revenue during that period was materially affected by the alleged insider trading scheme.

---

[6] It should be noted that a case cited by plaintiffs appears to suggest that if a company's earnings are substantially derived from illegal sources, its earnings statements may constitute violations of Rule 10b-5 even absent a statement that puts the cause of the company's success at issue. *See Greenfield v. Prof'l Care, Inc.*, 677 F. Supp. 110, 113 (E.D.N.Y. 1987). However, as at least one other court has noted, *Greenfield* represents the minority view in this Circuit. *See Menkes v. Stolt-Nielsen S.A.*, 2005 U.S. Dist. LEXIS 28208, at *22–*23 (D. Conn. Nov. 10, 2005). Moreover, the Complaint does not allege that any of the earnings statements within the class period reported revenue gained from the insider trading scheme.

## 2. Qualitative Assessments of the Strength of FBR's Business

In allegedly misleading statements from the seven press releases, defendants commented favorably, though cautiously, on FBR's business model and its prospects for future success. An April 27, 2004 press release typifies the tenor of defendants' remarks in the press releases. There, defendants reported:

> Our progress into the second quarter is keeping us solidly on track to meet our goals for 2004. The investment banking backlog continues to exceed five billion dollars, and we remain confident in our ability to execute our investment banking assignments through financial sector and interest rate volatility.

(Compl. ¶ 51 (omission in original).) Although defendants did offer a handful of less guarded, and more specific predictions earlier in the class period, the Complaint provides no conceivable basis to suggest that those predictions were rendered misleading by the nondisclosure of defendants' alleged involvement in the 2001 insider trading violations. Rather, judging from the Complaint, it appears that these predictions were accurate forecasts of the company's performance during particular periods. (*See* Compl. ¶ 38 ("We clearly expect [as of May 2003] that our earnings in the coming quarters will support our $0.34 quarterly dividend with the deployment of our excess capital at targeted leverage levels in the mortgage-backed portfolio."); *id.* ¶ 48 ("The last three months of 2003 represented a record quarter for the company and the culmination of a record year. . . . We expect higher earnings in the first quarter of 2004 from both our MBS portfolios . . . and our merchant banking business . . . .") *id.* ¶ 51 ("FBR's record results for the first quarter [of 2004] are evidence that our strategy and execution have been effective.") Additionally, defendants offered, in very broad terms, possible reasons for FBR's success, citing "innovative capital solutions [and] independent research views" (Compl. ¶ 35), "$269 million in equity capital . . . with virtually no leverage, prudent

15

hiring and cost discipline" (*Id.*), the "very positive impact [of merger with an affiliated corporation] . . . [o]n our success attracting investment banking business" (*Id.* ¶ 38), "unwavering discipline" [7] (*Id.* ¶ 48), and finally "strategies for managing our mortgage-backed securities portfolio" (*Id.* ¶ 51).

To the extent that the cited statements do not constitute immaterial puffery, *see Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996), the Court finds that defendants' alleged omissions are not "sufficiently connected to Defendants' existing disclosures to make those public statements misleading." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006). It appears that plaintiffs' theory is that the statements in the press releases were sufficiently connected to the undisclosed activity at the time the statements were made because the success of FBR's ongoing operations and its financial condition might be harmed if the insider trading scheme came to light and the company or its executives were sanctioned. (*See* Compl. ¶¶ 37, 76; Pls.' Opp'n 10, 16.) However, courts in this Circuit "have required a connection between the illegal conduct and the [allegedly misleading] statements beyond the simple fact that a criminal conviction would have an adverse impact upon the corporation's operations in general or bottom line." *Menkes*, 2005 U.S. Dist. LEXIS 28208, at *21. This connection is required because companies are "not obligated to speculate as to the myriad of consequences, ranging from minor setbacks to complete ruin, that might have befallen the company if the [illegal conduct were] discovered, disclosed or terminated." *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677–78 (S.D.N.Y. 1990).

---

[7] Particularly in the absence of a specific allegation in the Complaint explaining why defendants' description of FBR's "unwavering discipline" is fraudulent, the Court understands this phrase to refer FBR's management of financial risks.

16

Plaintiffs cite a number of cases in which courts have found a sufficient connection. (Pls. Opp'n 8–9.) Those cases suggest three overlapping propositions, none of which supports plaintiffs' claim for relief. First, where a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices. *See, e.g., Van Der Moolen*, 405 F. Supp. 2d at 388, 393–94, 400–01 (S.D.N.Y. 2005) (where statements put the sources of revenue from trades of NYSE specialists at issue, the alleged failure to disclose that the true source of that revenue was improper trading could give rise to liability); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 824–25 (E.D. Pa. 2001) (where defendants' statements attributed income and revenue successes to "customer-focused approach," complaint stated a claim under § 10(b) through specific allegations that illegal or fraudulent business practices were the hidden cause of the company's financial success). Here, there is no allegation in the Complaint that FBR's involvement with an insider trading scheme in connection with a single offering in October 2001 was the source of the financial success referred to in defendants' statements made in 2003 and 2004.

Second, courts have found the requisite connection between improper activity and affirmative statements where defendants made specific statements that could be interpreted as suggesting that the undisclosed improper activity alleged by plaintiffs was not occurring. *See, e.g., Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statement that integrity and dedication to complying with letter and spirit of the laws was at the heart of defendant's business and that defendant, unlike others, issued "truly independent investment research" could have been misleading as

17

defendants allegedly knew that company's investment research was beset by pervasive conflicts of interest ); *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, at *10–*11 (S.D.N.Y. Aug. 30, 2000) (statement that defendant faced intense competition with competitor could have been misleading as it did not disclose that defendant and competitor, both of whom accounted for a dominant share of the market, had entered into a price-fixing agreement); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677–78 (S.D.N.Y. 1990) (statements suggesting that defendant had particular ability to obtain FDA approval could have been misleading as defendant's success in getting approvals was due to bribery of FDA employees). Here, plaintiffs do not point to any specific statement in the press releases that could be interpreted by a reasonable investor as suggesting that the company or its executives had not assisted or participated in a single insider trading violation. *See In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 475 (S.D.N.Y. 2006) (broad statements of defendant's "culture of excellence" and "dedication to client service" were not actionable in light of allegations of insurance company's improper steering and bid manipulation).

Third, optimistic "projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them." *In re IBM Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (internal citations omitted); *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true."); *Lapin*, 506 F. Supp. 2d at 239 (finding that such optimistic

18

assessments may be actionable "upon a showing that the defendants did not genuinely or reasonably believe the positive opinions they touted . . . or that the opinions imply certainty."). For instance, in what plaintiffs call a "strikingly similar" case, the complaint stated a claim under 10b-5 where defendants, in the face of federal investigations into the company's violations of financial aid regulations and indictments of company personnel, still discussed the company's financial outlook in a "highly positive manner."[8] *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 245 (E.D.N.Y. 1989). To deflect the suspicions of investors aware of the investigations and indictments, defendants touted the company's "additional, elaborate compliance and control steps" as the "best procedures in the industry" and reassured investors that the company believed that "if any employees violated any government regulations, those employees were acting against Company policy." *Id.* at 245–46. What defendants allegedly knew but failed to disclose was that the company's administration of federal financial aid, which accounted for 85 to 90% of its revenue, was beset by a massive fraud that resulted in the suspension of the company from financial aid programs and a federal racketeering indictment of the company, its Chairman/President, and eighteen other company employees. *Id.* at 244–46. Here, defendants opined in general terms that the company and its investment banking business would likely remain profitable. They are alleged to have made no guarantees or to have bolstered their predictions of continued prosperity with specific statements that were false or misleading.[9]

---

[8] The plaintiff in *Ballan* purchased his shares of the company after the company had revealed the federal investigation and the first set of indictments. *See id.* at 247–48.

[9] It should also be noted that the Complaint does not allege that defendants' statements were false or misleading for failure to disclose the SEC or NASD investigations at an earlier time. (*See, e.g.*, Compl. ¶ 37.)

19

### 3. FBR's Risk Management Program

In its 2002 and 2003 10-Ks the company reported that FBR had a "corporate wide risk management program approved by our Board of Directors." (Compl. ¶¶ 36, 49.) Defendants represented that the program was designed to focus on:

- Identifying, assessing and reporting on corporate risk exposures and trends.
- Establishing and revising as necessary policies, procedures and risk limits.
- Monitoring and reporting on adherence with risk policies and limits.
- Developing and applying new measurement methods to the risk process as appropriate.
- Approving new product developments or business initiatives.

(*Id.*) Investors were cautioned that FBR "[could] not provide assurance that our risk management program or our internal controls will prevent or reduce the risks to which we are exposed." (*Id.*) Defendants' discussion of the risk management program carefully avoids making any claims about the program's effectiveness both in the description of its aims and in the cautionary statement following that description. Nevertheless, these statements regarding the risk program were misleading or false according to plaintiffs because "FBR lacked an effective compliance program as evidenced by the fact that its CEO and founder, Friedman, and its chief compliance officer, Nicholas [sic], were involved in and aided and abetted violations of the federal securities laws." (*Id.* ¶ 37.) The Complaint does not allege that the risk management program did not exist, or that it did not have the abovementioned aims. *Cf. Novak v. Kasaks*, 216 F.3d at 311 (finding that filings stating that company would follow a particular markdown policy were materially misleading where company actually followed a different policy). Rather, plaintiffs claim that defendants' brief description of the compliance program's aims misled investors into believing that they had an effective compliance program that would

20

root out any impropriety, including the alleged insider trading scheme. Such an allegation fails to state a claim of securities fraud. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) (noting that "it is not a violation of the securities laws to simply fail to . . . provide sufficient internal controls or loan management practices" while holding that defendants' statement that "internal controls not only existed, but were properly centralized, supervised, and managed" could be actionable); *Ballan*, 720 F. Supp. at 245 (defendants misled investors by claiming the existence of "additional, elaborate compliance and control steps which [they believed to be] the best procedures in the industry"). In contrast to *Shapiro* and *Ballan*, defendants are not alleged to have provided any qualitative assurances that FBR's compliance program was "properly" managed or employed the "best" procedures in the industry. Under plaintiff's theory of its case, any company that has a compliance program and discloses that program in even the most austere terms would be required, *ipso facto*, to disclose any possible deviation that came to its attention. The policy effect of such an approach is questionable.

### 4. Cautionary Statements Regarding Regulatory Risks

In its 10-K filings at the end of 2002 and 2003, FBR included a boilerplate description of the regulatory risks and costs associated with operating a securities business. In both filings, defendants reported that the "securities business is subject to extensive regulation," and that "[c]ompliance with these laws can be expensive, and any failure to comply could have a material effect on our operating results." (Compl. ¶¶ 36, 49.) Defendants cautioned further that "[c]ompliance with many of the [applicable] regulations . . . involves a number of risks, particularly in areas where applicable regulations may be subject to interpretation." (*Id.*) Defendants also explained how non-

compliance might harm FBR's bottom line, advising that "[i]n the event of a non-compliance with an applicable regulation, governmental regulators and self-regulatory organizations . . . may institute administrative or judicial proceedings that may result in: censure, fines or civil penalties[;] . . . suspension or disqualification of the broker-dealer's officers or employees; or other adverse consequences" which could, in turn, have a "material adverse effect on [FBR's] operating results and financial condition." (*Id.*)

Plaintiffs suggest two principal reasons to explain how these statements could have misled a reasonable investor: (1) that the statements failed to disclose that the discovery of noncompliance by senior executives like Friedman would be more harmful to FBR than if less senior employees were involved (Compl. ¶ 37(b)), and (2) that the statements implied that FBR had complied with its regulatory obligations, when in fact it had not (Pls.' Opp'n 10). Plaintiff's first theory is without substance. FBR informed investors that the company's profitability could be seriously harmed if regulatory proceedings were instituted against its officers or employees. While FBR arguably failed to disclose the marginal potential harm associated with an investigation of Friedman as opposed to less senior executives, it was under no obligation to do so. A reasonable investor would understand both from defendants' statements and from even the barest modicum of common sense that regulatory proceedings against Friedman and other equally senior executives would be more harmful than similar proceedings against junior employees. *Cf. Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 361 (2d Cir. 2002) ("As for the alleged difficulty of valuation, that should have been obvious to a prospective investor given, *inter alia*, the types of loans eBanker financed.")

Plaintiffs' second explanation of the misleading nature of the cautionary statements is similarly flawed. Though ubiquitous in securities filings, *see Halperin*, 295 F.3d at 359, cautionary statements of potential risk have only rarely been found to be actionable by themselves. *See Libon v. Infineon Techs., AG*, No. 04 Civ. 929, 2006 U.S. Dist. LEXIS 76430, at \*26 (E.D. Va. Aug. 7, 2006) (Lauck, M.J.) (citing cases). Rather, courts generally assess cautionary language to determine whether that language insulates a defendant from liability under the "bespeaks caution" doctrine. *See Halperin*, 295 F.3d at 357. In *Halperin*, the Second Circuit endorsed a two-step inquiry to determine whether plaintiffs facing a motion to dismiss a securities fraud complaint have "overcome the existence of [cautionary] language." *Id.* at 359. First, courts should "identify the allegedly undisclosed risk." *Id.* Then, they should look at the allegedly fraudulent materials as a whole including the cautionary language "to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist." *Id.* In *Rombach v. Chang*, the Second Circuit supplemented this inquiry with the advice that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." 355 F.3d 164, 173 (2d Cir. 2004).

In *Van Der Moolen*, the Court interpreted *Rombach*'s proviso regarding warnings of an already transpired risk, and statements similar to it, as supportive of the imposition of 10b-5 liability on defendants whose only misleading statement was an allegedly inadequate warning of risk. *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005). In such a case, defendant's cautionary language generally inserted as a shield against liability is wielded as a sword to impose liability on the theory

that a boilerplate warning about risks of loss necessarily implies to investors that no loss has ever transpired. Thus, the court in *Van Der Moolen* denied a motion to dismiss, finding that the warnings in that case could have misled investors into believing that defendants had always complied with their regulatory obligations. *Id.* Following the reasoning of a similar decision from the Eastern District of Pennsylvania, the *Van Der Moolen* court was persuaded that "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Id.* (quoting *Voit v. Wonderware Corp.*, 977 F. Supp. 363, 371 (E.D. Pa. 1997)). The defendants in *Van Der Moolen* had not only warned of the risks associated with noncompliance with its regulatory obligations, but had also detailed the specific trading restrictions to which its NYSE specialists were bound to adhere. *Id.* at 415–16. Plaintiffs alleged that a widespread violation of the trading restrictions had allowed the company to inflate its profits substantially while defendants' cautionary language had implied that the defendants had complied with NYSE restrictions on trading by specialists. *Id.* at 393. In this context, the court found that the warnings could be actionable on their own.

*Voit v. Wonderware Corp.*, 977 F. Supp. 363 (E.D. Pa. 1997), involved a suit by a former executive of a company acquired in a stock-for-stock merger. The plaintiff alleged that defendants (the acquiring company and its executives) had misled the target company's shareholders by suggesting that the defendant corporation's chairman and CEO would remain in his position after the merger and that the combined company's profit margin would continue at its present rate. *Id.* at 366. The *Voit* court found that defendants' warnings that the company's continued success depended on its ability to

24

retain certain key employees and that there could be no assurance that the company's operating margins could be sustained in the future were themselves misleading in light of defendants' promise to inform plaintiff of any adverse, material changes. *Id.* at 371. "[G]iven the context in which they were made," the *Voit* court held that defendants' warnings of risk could be actionable as a matter of law. *Id.*

By contrast, a number of courts have found that cautionary statements are "not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results" because such cautionary language is not misleading. *See In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048–49 & n.13 (N.D. Cal. 2007) (criticizing *Van Der Moolen,* collecting similar decisions from the Northern District of California, and finding, on a motion to dismiss, that the disclosure of standard market risk factors was not misleading); *Zeid v. Misrahi,* 930 F. Supp. 431 (N.D. Cal. 1996) ("boilerplate" warnings of market risk factors not actionable as a matter of law).

As the *Halperin* court explained, "[i]n all cases . . . the court must keep in mind that a complaint fails to state a claim of securities fraud if no *reasonable investor* could have been misled about the nature of the risk when he invested." 295 F.3d at 359 (emphasis in original). Given this flexible standard, the Court declines to find that boilerplate risk factors can *never* provide a basis for liability. However, in the case *sub judice,* the Court finds that defendants' boilerplate description of its regulatory risks could not have been misleading to a reasonable investor as the description "said nothing company-specific, and no reasonable investor would infer anything about the state of [the company's regulatory] compliance." *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 905

(N.D. Ill. 2001). Rather all of the information in the warnings "could be gleaned from the C.F.R." *Id.* Significantly, defendants never claimed that the company was in "full compliance with all regulations, or that it had no outstanding regulatory issues." *Id.* at 904. Of equal importance, defendants did not imply such full compliance by touting their compliance policies, *see Ballan*, 720 F. Supp. at 245, or a special corporate culture regarding compliance, *see Lapin*, 506 F. Supp. 2d at 240. In addition, the alleged regulatory violation related to a single, isolated event, which unlike *Van Der Moolen*, did not involve a significant percentage of FBR's revenue. *See Van Der Moolen*, 405 F. Supp. 2d at 393.

The Court notes, moreover, that the contested disclosure focused on the risk of loss from regulatory violations that had yet to transpire. At the time that the cautionary statements were made, the risk that FBR's noncompliance with securities regulations would actually cause a loss to the company or its shareholders had neither "transpired" nor become a "near certainty." *See Rombach*, 355 F.3d at 173. To be sure, the alleged noncompliance had occurred. But the Complaint does not allege that it was sufficiently clear when the 10-Ks were filed on March 28, 2003 and March 15, 2004 that FBR's noncompliance (in 2001) would cause a financial loss.[10] Therefore the Complaint does not allege that this risk had already transpired.

To the extent that the foregoing analysis is inconsistent with *Van Der Moolen*, the Court declines to adopt the approach employed there. At least in this case, finding that defendants misled investors by informing them of the financial risks associated with an

---

[10] The Complaint's citation to the November 10, 2004 report on TheStreet.com does not indicate otherwise. The article states that "[a] 10-month regulatory investigation into the murky world of private placements and hedge funds might have found its first target in Friedman Billings Ramsey" and that at some point that spring, "the SEC [had] issued subpoenas and requests for documents to 20 brokerages that have arranged so-called PIPE deals." (Compl. ¶ 59.)

investment in a business regulated by the securities laws would invite the transformation of Rule 10b-5 from a prohibition on investor deception into a mandate that corporations insure their investors against losses from regulatory violations.

## 5. Sarbanes-Oxley Certifications

Plaintiffs allege that the certifications made by the individual defendants pursuant to 18 U.S.C. § 1350, 15 U.S.C. § 7241(a)(5), and 17 C.F.R. §§ 229.601(b)(31)(i), 240.13a-14(a), were false or misleading because the individual defendants had not disclosed to outside auditors and to FBR's audit committee "any fraud . . . that involves management or other employees who have a significant role in the registrant's internal control[] [over financial reporting]." (Compl. ¶¶ 36, 39, 42, 46, 49, 52, 55.) The fundamental problem with plaintiffs' claim is that they do not allege with particularity the basis for their belief that the individual defendants did not disclose the insider trading fraud to FBR's auditors and its audit committee. As the Complaint includes no allegations as to the actions or obligations of the auditors, the Court is left to wonder whether plaintiffs just assume that the fraud was not disclosed to auditors because it was not disclosed to investors or if there are other, unalleged circumstances that support plaintiffs' belief. Indeed, though defendants raised this deficiency in their moving papers, plaintiffs' opposition papers failed to argue that the Complaint had properly explained plaintiffs' basis for believing that the certification statements were fraudulent.

Plaintiffs similarly neglected to answer defendants' argument that the certifications' "any fraud" language did not require the individual defendants to disclose the alleged inside trading scheme. The thrust of defendants' argument is that the certifications only referred to frauds "directly related to the preparation of financial

27

statements." *See* Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Securities Act Release No. 8238, Exchange Act Release No. 47,986, Investment Company Act Release No. 26,068, 68 Fed. Reg. 36,636, 36,640 (June 18, 2003). As the Complaint properly pleads neither an underlying fraud nor the individual defendants' failure to disclose that fraud to auditors, the Court declines to determine the scope of the "any fraud" portion of the certification in the absence of briefing from both sides.

## C.  Section 20 Liability

As plaintiffs have not sufficiently alleged primary liability under Section 10(b), they have also not alleged control person liability under Section 20 of the Exchange Act. , 15 U.S.C. § 78t(a). *See In re Axis Capital Holdings Ltd. Secs. Litig.*, 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006) (collecting cases).

## CONCLUSION

In light of FBR's settlement with the SEC and NASD, the record before the Court indicates that plaintiffs may be able to cure certain of the defects in the Complaint. For the foregoing reasons, defendants' motion to dismiss [47] is granted. Plaintiffs have thirty (30) days from the date of this Memorandum Opinion and Order to move for leave to file an amended complaint.

SO ORDERED.

Dated: New York, New York
        March 31, 2008

28

Richard J. Holwell
United States District Judge